850 F.2d 692
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
DENVER CLARK HOMES, INC., and Pioneer Homes, Inc.,
Plaintiffs-Appellants,
v.
The HARTFORD FIRE INSURANCE CO., Defendant-Appellee.
 No. 87-1767.
 United States Court of Appeals, Sixth Circuit.
 July 5, 1988.
 
 Before MILBURN, RALPH B. GUY, Jr., and ALAN E. NORRIS, Circuit Judges.
 PER CURIAM.
 
 
 1
 The district court granted a summary judgment to the defendant, Hartford Fire Insurance Company (Hartford). Hartford had been sued after denying coverage under a multi-peril policy issued to plaintiffs (Denver). The district court concluded that there had been no "occurrence" within the meaning of the policy. We agree and affirm.
 
 I.
 
 2
 Denver builds and sells residential homes. In 1973, it began a residential development in Shelby Township, Michigan, known as the Stonewyck Manor subdivision. At the time of development, city water was anticipated but not yet available. Consequently, Denver installed dry water mains and planned to provide temporary, shallow wells for the new homeowners. Since water from temporary, shallow wells may contain nitrates which are harmful in higher concentrations, Denver agreed with Shelby Township officials to provide each home purchaser with a written statement advising of the temporary nature of the well and the health significance of nitrates as they may occur in such well water. The Macomb County Health Department drafted an advisory memorandum for Denver to give to purchasers warning them of the potential hazard from nitrates in water drawn from temporary, shallow wells. Each purchaser was to sign an acknowledgement of receipt of the memorandum. When Denver installed the wells, however, it installed deep, permanent wells throughout the subdivision because there was an insufficient amount of water on some lots for shallow wells. There is no risk of nitrate contamination with water from deep, permanent wells. Contrary to its agreement with the health officials, Denver did not tell purchasers about the well situation, ostensibly because deep rather than shallow wells had been installed.[1] To make matters worse, Denver also forged the names of the purchasers on the acknowledgements.
 
 
 3
 In the summer of 1979, several purchasers discovered that their signatures had been signed to the nitrate memorada and that they had not been told of the nitrate hazard in water drawn from temporary, shallow wells. They immediately quit drinking the well water and switched to bottled water, which they drank until they were connected with city water in December, 1984.
 
 
 4
 On April 2, 1980, seven married couples who had purchased homes in 1976 and 1977 filed suit against Denver. Their complaint alleged in count I that the defendants fraudulently concealed that the homeowners' water would be drawn from temporary, shallow wells and that the water would contain nitrates and other hazardous pollutants. The plaintiffs alleged that the defendants concealed these material facts to induce plaintiffs to purchase their homes. Count II alleged that the fraudulent acts and omissions were wanton, willful, and malicious. Upon being served with the complaint, Denver promptly informed Hartford which, by letter dated April 27, 1980, declined to defend the suit and denied coverage.
 
 
 5
 The homeowners' suit went to trial in 1986 and resulted in total judgments against the defendant of $11,325.00. The case had gone to the jury under two theories--fraudulent concealment of material facts and willful and wanton misconduct. The jury found fraudulent concealment but found for the defendants on the issue of willful and wanton misconduct.
 
 
 6
 After the homeowners' judgment was rendered against it, Denver instituted this action against Hartford claiming both a breach of the insurance contract duty to defend and breach of the duty to indemnify. The matter was resolved adversely to Denver in the district court on cross-motions for summary judgment.
 
 II.
 
 7
 Hartford's summary judgment motion was predicated on its position that there was no coverage under the policy or, in the alternative, if there was general coverage for this type of "occurrence," that a variety of policy exclusions were applicable. Like the district court, we find it unnecessary to consider the policy exclusions since we agree with Judge Feikens that there was no "occurrence" as that significant term is defined in the policy.
 
 
 8
 The policy in issue defines "occurrence" to mean "an accident, including continuous or repeated exposure to conditions which result in bodily injury or property damage neither expected nor intended from the standpoint of the insured." The key portion of the definition is that relating to injury or damage which is "neither expected nor intended by the insured." Hartford argues that this language effectively excludes from coverage "intentional acts" of an insured. Denver does not find solace in the policy language but, rather, from various Michigan court decisions dealing with "intentional acts" exclusions. See, e.g., Linebaugh v. Berdish, 144 Mich.App. 750, 755-56, 376 N.W.2d 400 (1985), and Iacobelli Construction Co. v. Western Casualty & Surety Co., 130 Mich.App. 255, 261-64, 343 N.W.2d 517 (1983). These cases, in relevant part, stand for the proposition that there must not only be an intentional act on the part of an insured but that the specific injury that follows must also be intended.
 
 
 9
 Plaintiffs concede, however, that other panels of the Michigan Court of Appeals have recognized a distinction between "intentional" acts and "expected" acts. Under this line of cases an insurer avoids liability for an expected injury if it shows that the injury was the natural, foreseeable, expected, and anticipated result of an intentional act. See Allstate Insurance Co. v. Freeman, 160 Mich.App. 349, 408 N.W.2d 153 (1987), leave granted, 430 Mich. 857 (1988); State Farm Fire & Casualty Co. v. Jenkins, 147 Mich.App. 462, 382 N.W.2d 796 (1985); Western Casualty & Surety Co. v. Coloma Township, 140 Mich.App. 516, 521, 364 N.W.2d 367 (1985); Frankenmouth Mutual Insurance Co. v. Kompus, 135 Mich.App. 667, 354 N.W.2d 303 (1984), leave denied, 421 Mich. 863 (1985). Coloma Township is the only one of the cases that specifically deals with claims for fraud and misrepresentation and concludes that such claims do involve intentional acts.
 
 
 10
 Under the facts of this case, we find it unnecessary to resolve the apparent conflict between the Michigan cases. We believe that even if the construction which is more favorable to an insured--that of intended acts and intended consequences--is given to this policy, there is still no coverage. The intended acts here were the concealment of the requirement that purchasers be informed of the well problem and the forged acknowledgements. The intended consequences were that the purchasers would not be frightened away and would go ahead and buy. It is not a requirement that a wrongdoer have intended each and every specific element of damages that follows from the intended acts and intended consequences.[2] Certainly here, however, even the specific elements of damage were foreseeable. It therefore follows that there clearly was no duty to indemnify under the policy.
 
 III.
 
 11
 Denver also argues, however, that the duty of an insurer to defend a lawsuit brought against its insured is separate and severable from its duty to indemnify the insured for liability imposed after trial. There can be no doubt that this is a correct statement of Michigan law. Reurink Brothers Star Silo, Inc. v. Maryland Casualty Co., 131 Mich.App. 139, 345 N.W.2d 659 (1983); Detroit Edison Co. v. Michigan Mutual Insurance Co., 102 Mich.App. 136, 301 N.W.2d 832 (1980) (the duty is not limited to meritorious suits and may even extend to actions which are groundless, false, or fraudulent, so long as the allegations against the insured even arguably come within the policy coverage).
 
 
 12
 Although it is clear that in the Michigan cases all doubts are resolved in favor of interpreting a complaint so that coverage would result, even this liberal construction will not save plaintiffs here. The homeowners' complaint clearly alleged fraudulent concealment. The state trial court correctly instructed the jury on the elements of this act as follows:
 
 
 13
 The elements of fraudulent concealment are:
 
 
 14
 1. Defendant suppressed or concealed a material fact which he had a duty to disclose to plaintiffs;
 
 
 15
 2. Suppression or concealment of that material fact created a false impression of fact in the minds of plaintiffs;
 
 
 16
 3. Defendant knew that he was suppressing or concealing information which, if not disclosed, would create a false impression of fact in the minds of plaintiffs;
 
 
 17
 4. Defendant intended that plaintiffs would act upon the false impression of fact;
 
 
 18
 5. Plaintiffs acted in reliance upon the false impression of fact created by the suppression or concealment of information; and
 
 
 19
 6. Plaintiffs sustained damage as a consequence of such reliance.
 
 
 20
 This definition encompasses both the requirement that an alleged tortfeasor intend the act and the consequences, and a complaint so worded simply does not charge an "occurrence" within the meaning of the policy here. Plaintiffs' argument that they never intended to hurt anyone in the sense of physical harm is unavailing. That was not the gravamen of the homeowners' complaint. Although under Michigan law insurance companies always proceed at their peril when they refuse to defend, this does not mean that all lawsuits must be defended. The legal analysis made by the defendant here of the homeowners' cause of action caused them to correctly conclude that there was no duty to defend under these circumstances.
 
 
 21
 AFFIRMED.
 
 
 
 [1]
 It is impossible to tell from the record in this case whether deep wells were installed on each lot, but we assume for the purposes of this appeal that they were
 
 
 [2]
 Plaintiffs attach undue significance to the fact that the jury did not find them guilty of willful and wanton misconduct. Willful and wanton misconduct was the necessary predicate to the homeowners recovering exemplary damages. The fact that the jury did not award exemplary damages does not mean that plaintiffs did not commit intentional acts and intend the consequences thereof resulting in compensatory damages to the homeowners